**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| **JOHN DOE, M.D.,** |
| **Plaintiff,** |
| v. |
| **PROVIDENT LIFE & ACCIDENT INSURANCE COMPANY,** |
| **Defendant.** |

Civil Action 07-00633 (HHK)

**MEMORANDUM OPINION AND ORDER**

A physician, John Doe, M.D. ("Doe"),[1] alleges that he suffers from Post Traumatic Stress Disorder ("PTSD") and, as a result, is disabled from his occupation as an emergency room ("ER") physician. He filed this suit against his disability insurance provider, Provident Life and Accident Insurance Company ("Provident"), when Provident refused to pay his claim for disability benefits. Doe's complaint asserts causes of action for breach of contract and "bad faith" in the administration of his insurance policy.[2]

Before the court is Provident's motion for summary judgment [#35]. Upon consideration of the motion, the opposition thereto, and the summary-judgment record, the court concludes that the motion should be granted in part and denied in part.

---

[1] "John Doe" is a pseudonym which plaintiff is permitted to use in the filings in this case pursuant to his motion to do so.

[2] The parties agree that Virginia law governs Doe's breach of contract claim, and District of Columbia law governs his bad faith claim. Count III of Doe's complaint purports to assert a claim for "Injunctive and Declaratory Relief." As the language of Count III indicates, Count III asserts an entitlement to types of relief and does not set forth a claim or cause of action.

## I. BACKGROUND

Doe earned his M.D. in 1975. In the late 1970s, he began seeing a psychiatrist, Constantine Kyropoulos ("Kyropoulos"), to address certain psychological issues. Doe completed his residency and was board-certified in emergency medicine in 1981. After his residency, Doe, an Air Force Academy graduate, worked as an ER physician at Andrews Air Force base and other military hospitals until 1984. While working for the military, Doe also worked part-time as an ER doctor for Capital Emergency Associates ("CEA"). Once he had fulfilled his military obligation, Doe began working full-time at CEA and became a partner there in 1985 or 1986. While working full-time at CEA, Doe averaged 24-30 clinical hours and 6-8 non-clinical hours per week. As a partner, his annual income was approximately $150,000 to $250,000 per year.

While working full-time at CEA, Doe applied for a disability insurance policy from Provident. Doe's application provided: (a) "Occupation: Physician"; (b) "Exact duties: E.R. Physician"; (c) "Employer: Capital Emergency Associates, P.A."; and (d) "Nature of business: Emergency Medicine." (Pl.'s Mem. in Opp'n to Mot. for Summ. J. [#41], Ex. 3 at 1.)[3] The Policy provides, in relevant part:

> Sickness means sickness or disease which manifests itself while your policy is in force. (Pl.'s Mem. in Opp'n to Mot. for Summ. J. [#41], Ex. 2 at 4.)
>
> [Y]our occupation means the occupation (or occupations, if more than one) in which you are regularly engaged at the time you become disabled. (*Id.*)
>
> Total Disability means that due to Injuries or *Sickness*: (1) you are not able to perform the substantial and materials *duties* of your *occupation*; and (2) you are under the care and attendance of a Physician. (*Id.*) (emphasis added).

---

[3] At the time Doe completed his disability insurance application, he lived in Virginia, (*id.* at 1), and signed his application there, (*id.* at 4). Provident also issued the disability insurance policy to Doe while he lived Virginia.

> [Partial/]Residual Disability means that due to Injuries or Sickness: (1) you are not able to do one or more of your substantial and material daily business duties or you are not able to do your usual daily business duties for as much time as it would normally take you to do them; (2) you have a Loss of Monthly Income of at least 20%; and (3) you are under the care and attendance of a Physician. (*Id.* at 7.)

A company called Em Care ("EC") purchased CEA in 1994 or 1995. As a partner of CEA, Doe was required to remain with EC for two years following the acquisition in order to obtain his full share of the proceeds from the acquisition. Doe fulfilled that two-year obligation, but during that time began to experience serious psychological symptoms, which he alleges were a result of his work in the ER. (*See* Pl.'s Mem. in Opp'n to Mot. for Summ. J. [#41], Ex. 38 at 118-19.) Doe discussed his symptoms with Kyropoulos, with whom he had consulted about psychological issues including hypersensitivity, anxiety, depression, irritability, and a facial spasm since the 1970s. During 1997, Doe also took medication to manage his symptoms, and he began to reduce his work hours in the ER. This reduction coincided with his receipt of the full proceeds from the sale of CEA, which Doe testified provided him with the means to pursue a semi-retirement. It is from this time, when Doe began to reduce ER work in 1997, that he claims Residual Disability. In 1999, Doe began counseling sessions with a clinical social worker, John Schwartz ("Schwartz"), with whom he discussed his desire to semi-retire as well.[4] (*See* Def.'s Mot. for Summ. J. [#35], Ex. 7.)

In 2000, Doe began working in internal medicine ("IM") at Price Medical ("Price") to supplement his reduced ER work. According to Doe, he can work as an internist because it carries with it less pressure than ER work. His regular schedule at Price is part-time, but Doe

---

[4] This was not the first time Doe had mentioned his desire for early retirement or semi-retirement. In 1989 he mentioned the same desire to Kyropoulos during therapy. (*See* Def.'s Mot. for Summ. J. [#35], Ex. 9 at 2.)

works full-time when he needs to cover for other physicians. According to Doe, the transition from ER to IM carried with it a significant loss of income. Doe later entered therapy with another clinical social worker, Kevin Spera ("Spera"), from January 2003 through December 2004. That therapy addressed Doe's previous psychological issues as well as anxiety relating to ER work, aging, and a new romantic relationship. (Pl.'s Mem. in Opp'n to Mot. for Summ. J. [#41], Ex. 7 at 1; Def.'s Reply to Opp'n to Mot. for Summ. J. [#48], Ex. 15 at ¶ 2.) In 2004, Doe ended his treatment with Spera and withdrew from ER work completely. It is from this date, when Doe ceased all ER work in 2004, that he claims total disability. Although Doe typically works a part-time schedule at Price, he has not attempted to take on a full-time schedule nor has he sought other work as an IM physician.

In 2005, Doe read an article about PTSD and concluded that his symptoms fit the disorder. In July 2005, Doe consulted a psychiatrist, Gale Neufeld ("Neufeld"), about PTSD. Neufeld diagnosed Doe as suffering from "Axis I: Post-traumatic Stress Disorder, Chronic (309.81)." (Pl.'s Mem. in Opp'n to Mot. for Summ. J. [#41], Ex. 9 at 8.) Neufeld then referred Doe to a psychologist, Thomas Gilmore ("Gilmore"). Gilmore diagnosed Doe as suffering from an adjustment disorder with anxiety and in August 2005 began treating Doe for essentially the same symptoms for which Spera had treated him. In contrast to Neufeld and Gilmore, Spera never diagnosed Doe as suffering from post-traumatic stress disorder or any other disorder,[5] (Def.'s Reply to Opp'n to Mot. for Summ. J. [#48], Ex. 15 at ¶ 4), although Spera did observe

---

[5] It appears from the record that Kyropoulos and Schwartz likewise never diagnosed Doe with PTSD nor any other disorder.

that Doe's anxiety and depression would make it difficult for him to continue working in the ER, (Pl.'s Mem. in Opp'n to Mot. for Summ. J. [#41], Ex. 7 at 1).[6]

In December 2005, Doe submitted a disability claim to Provident, along with a required Physician Questionnaire, (Pl.'s Mem. in Opp'n to Mot. for Summ. J. [#41], Ex. 15), and Gilmore's Attending Physician Statement, (Pl.'s Mem. in Opp'n to Mot. for Summ. J. [#41], Ex. 14), which indicated that Doe suffered from PTSD. In January 2006, Provident acknowledged receipt and appointed an agent, Diane Freeman ("Freeman"), to handle Doe's claim. Thereafter, Doe signed an authorization to release records of Gilmore's treatment, (Pl.'s Mem. in Opp'n to Mot. for Summ. J. [#41], Ex. 19), interviewed with Freeman via phone, (*see* Pl.'s Mem. in Opp'n to Mot. for Summ. J. [#41], Ex. 20), and Provident received Neufeld's evaluation diagnosing Doe with PTSD, (Pl.'s Mem. in Opp'n to Mot. for Summ. J. [#41], Ex. 9 at 8). After Provident informed Gilmore that a summary of treatment in lieu of records was fine, (*see* Pl.'s Mem. in Opp'n to Mot. for Summ. J. [#41], Ex. 21), Gilmore provided Provident with a summary, which diagnosed Doe as suffering from PTSD, (Pl.'s Mem. in Opp'n to Mot. for Summ. J. [#41], Ex. 22). Based on the foregoing, Provident informed Doe that it would consider August 2005 — when he began treatment with Gilmore — as the onset of his alleged disability. (*See* Pl.'s Mem. in Opp'n to Mot. for Summ. J. [#41], Ex. 23 at 2.)

Provident then requested additional materials from Doe to complete the evaluation of his claim including a supplemental statement from Doe, his personal tax returns, a primary care

---

[6] The court observes that these exhibits are contradictory insofar as one indicates that Spera concluded that Doe could not continue his ER work whereas the other indicates that Spera never reached such a conclusion. This contradiction notwithstanding, neither letter indicates that Spera diagnosed Doe with PTSD or any other disorder. The most Spera ever concluded was that ER work was too stressful for Doe to continue; of course this may be true for many people regardless of whether they suffer from a stress-based or an anxiety-based disability.

5

physician questionnaire, medical records from Spera, and employment verifications. (*See id.* at 4.) Doe provided Provident with some of these materials, namely his supplemental statement, (Pl.'s Mem. in Opp'n to Mot. for Summ. J. [#41], Ex. 24), and primary care physician questionnaire, (Pl.'s Mem. in Opp'n to Mot. for Summ. J. [#41], Ex. 25). Also, Spera sent a letter to Provident summarizing Doe's treatment. The letter did not mention PTSD or any other disorder, but it did describe Doe's ER-related anxiety and Spera's opinion that Doe could not continue working as an ER physician.[7] (Pl.'s Mem. in Opp'n to Mot. for Summ. J. [#41], Ex. 7.) Gilmore also provided a supplemental statement indicating that Doe's "PTSD symptoms prevent work in emergency medicine." (Pl.'s Mem. in Opp'n to Mot. for Summ. J. [#41], Ex. 26 at 1.)

Following the submission of these additional materials, a licensed mental health counselor, Laurie Ghiz ("Ghiz"), reviewed Doe's claim on behalf of Provident and concluded that Doe's claim was not sufficiently supported. (*See* Pl.'s Mem. in Opp'n to Mot. for Summ. J. [#41], Ex. 27 at 4.) She did, however, recommend further review of Doe's file if he submitted records from Gilmore and Spera. (*See id.* at 4-5.) Provident also retained a vocational consultant, Jean-Marie Merritt ("Merritt"), who opined that Doe's claim should be evaluated as that of an IM physician, not an ER physician. (*See* Pl.'s Mem. in Opp'n to Mot. for Summ. J. [#41], Ex. 29.) Freeman informed Doe of these initial determinations and requested his medical records from Spera and Gilmore, (*see* Pl.'s Mem. in Opp'n to Mot. for Summ. J. [#41], Ex. 32 at 1); the medical records were never submitted. Gilmore did, however, submit an additional letter opining that Doe "continues to experience PTSD symptoms" and "is not able to return to work in Emergency Medicine." (Pl.'s Mem. in Opp'n to Mot. for Summ. J. [#41], Ex. 31.)

---

[7] Although Spera provided this letter, he did not provide the medical records that Provident requested.

Provident did not approve Doe's disability claim. Specifically, Provident observed that Doe had gradually decreased his ER work while gradually increasing his IM work until he gave up ER medicine in favor of IM medicine — the implication being that Doe gave up ER medicine by his own free choice, rather than because of a disability. (*See* Pl.'s Mem. in Opp'n to Mot. for Summ. J. [#41], Ex. 32 at 1.) In any event, Provident concluded that Doe's occupation was that of an IM physician by 2004, the time from which he claims Total Disability. (*Id.*) In addition, Provident observed that Doe's income from his IM practice exceeded his income from his ER practice beginning in 2001. (*Id.*) Considering that Doe and his physicians and counselors all agree that Doe is able to perform the duties of an IM physician, Provident concluded that Doe provided insufficient evidence to establish that he is disabled from his occupation. (*See id.*) Provident informed Doe that he could appeal and that it would evaluate his claim further if Doe provided medical records from Gilmore or Spera.[8] (*Id.* at 2.) Doe did not provide these records.

By March 2007, Doe had ceased treatment with Gilmore. (*See* Pl.'s Mem. in Opp'n to Mot. for Summ. J. [#41], Ex. 38 at 127-28.) Doe filed this suit in April 2007. Doe met with Neufeld during this litigation, and she re-confirmed her PTSD diagnosis based on that meeting, their 2005 meeting, and her review of Gilmore's records. (Pl.'s Mem. in Opp'n to Mot. for Summ. J. [#41], Ex. 1.) In connection with this litigation, Doe also met with a medical expert retained by Provident who concluded that Doe does not have PTSD. Provident's expert, however, concluded that Doe suffers from various personality disorders as well as malingering symptoms of PTSD. (*See* Pl.'s Mem. in Opp'n to Mot. for Summ. J. [#41], Ex. 35 at 19.)

---

[8] Provident made numerous attempts via letter and telephone to obtain the medical records from Doe and the relevant physicians or counselors before denying Doe's claim. (*See* Def.'s Mot. for Summ. J. [#35], Ex. 5.)

## II. ANALYSIS

Doe, in effect, seeks to hold Provident liable on three claims: (1) Doe's claim that he was entitled to benefits under his disability policy for his Total Disability, (2) his claim that he was entitled to benefits under his disability policy for his Residual [Partial] Disability, and (3) his clam that Provident engaged in bad faith when it refused to pay the insurance benefits to which he asserts he was entitled. Provident asserts that there are no material facts in dispute and that it is entitled to judgment as a matter of law on each claim. For the reasons that follow, the court concludes that Provident is entitled to judgment on Doe's total disability and bad faith claims but that Doe's claim for partial disability must be submitted to a jury.

**A.     Total Disability Claim**

Under the Policy, "Total Disability" means that "you are not able to perform the substantial and materials duties of your *occupation*." Provident contends that Doe cannot meet this definition[9] because Doe's occupation at all pertinent times was, and is, that of an IM physician and he indisputably is able perform the duties of an IM physician. In response, Doe contends that he is an ER physician and that his occupation was that of an ER physician at least until 1997, when his partial disability began.[10] Doe's position cannot be sustained.

---

[9] Both total and partial disability also require that "you are under the care and attendance of a Physician." Provident also contends that Doe is not disabled because he never was under the care and attendance of a physician for his alleged PTSD. Doe counters that he was under the care of mental health professionals for nearly the entire period of his alleged disability and that he need not show that he sought treatment specifically for PTSD. Provident's argument is a distraction. The record is clear that Doe was under the care of mental health professionals for his psychological ailments. The plain language of the Policy requires nothing more.

[10] By omission, Doe seems to admit that the earliest possible onset of his alleged total disability was 2004, and that he was working primarily as an IM physician at that time. The record is consistent with that admission.

In a nutshell, Doe does not suffer from a "Total Disability" within the meaning of the Policy because he has always been and remains able "to perform the substantial and material duties of [his] occupation" as a physician.[11]  To avoid this conclusion, Doe asks the court to find that his occupation is that of an ER physician rather than a physician.  His request, however, would have the court draw "too fine [a distinction] under a common sense interpretation of . . . 'occupation.'"  *See House v. Am. United Life Ins. Co.*, 499 F.3d 443, 453 (5th Cir. 2007).  Moreover, Doe's proffered definition is not supported by the weight of the law nor of the facts.

With respect to the law, numerous courts that have interpreted similar disability insurance policies have held that the term "occupation" means a general occupation, such as a physician, rather than a particular job or position such as an ER physician.  *See, e.g.*, *House*, 499 F.3d at 453-55 (finding that trial lawyer was not totally disabled from his regular occupation because he could perform the duties of a lawyer); *Osborne v. Hartford Life and Accident Ins. Co.*, 465 F.3d 296, 298-300 (6th Cir. 2006) (finding that "[own] [o]ccupation is a more general term that seemingly refers to categories of work than narrower employment terms like 'position,' 'job,' or 'work,' which are more related to a particular employee's individual duties" in holding that president of financial institution was not disabled even though he no longer could travel for business); *Ehrensaft v. Dimension Works Inc. Long Term Disability Plan*, 120 F. Supp. 2d 1253, 1258-59 (D. Nev. 2000) (finding that "the term, '[own] occupation,' is a general description, not a specific one" in holding that CPA working as Controller was not disabled).  *But see, e.g.,*

---

[11] In reaching this conclusion the court looks first to the definition of "occupation" in the Policy: "occupation means the occupation (or occupations, if more than one) in which you are regularly engaged at the time you become disabled."  *See Atlantic Life Ins. Co. v. Worley*, 172 S.E. 168, 172 (Va.1934) ("Legal effect should be given to the language used [in] and the object to be accomplished by the contract.")  The court finds this definition entirely unhelpful because it uses the term "occupation" within the definition of "occupation" and thus seems to presuppose some generally-accepted, extra-contractual definition.

*Raithaus v. Unum Life Ins. Co. of Am.*, 335 F. Supp. 2d 1098, 1123-26 (D. Haw. 2004) (holding that insured's "regular occupation" was a urologist rather than a general practice physician).

Finding no controlling case law in Virginia, the court agrees with cases like *House*, *Osborne*, and *Ehrensaft*, which afford a more general meaning to the term occupation. The court notes that these cases interpreted "regular occupation" or "own occupation" rather than simply "occupation," the term at issue here. The court, however, finds these distinctions to be of no consequence, especially considering that the term "occupation" contains no qualifier such as "regular" or "own," which would narrow the meaning of occupation further. Thus, the term "occupation" should be viewed at as least as high a level of generality as these more limited terms. *See Osborne*, 465 F.3d at 300 (concluding that the distinction between "regular occupation" and "own occupation" is a relatively minor difference).[12] Here, Doe is a physician, which occupation encompasses the more specific positions of IM physician and ER physician. *See House*, 499 F.3d at 453-55; *Osborne*, 465 F.3d at 298-300; *Ehrensaft*, 120 F. Supp. 2d at 1258-59.

With respect to the facts, Doe identified his occupation as "Physician" in his application for the disability policy, and Doe concedes that he has been and remains able to perform the duties of an IM physician. Consequently, Provident is entitled to summary judgment on Doe's total disability claim.[13]

---

[12] The court also notes that because some of these cases involved ERISA plans, the courts accorded deference to the administrator's interpretation of "occupation." Nevertheless, the court would reach the same conclusion absent any deference. *See House*, 499 F.3d at 453-54.

[13] Provident also contends that it is entitled to summary judgment on Doe's disability claims because Doe failed to provide reasonably timely notice and because Doe failed to provide the required proof of loss — both of which are conditions precedent to coverage. The court has examined these two contentions and finds them to be without merit. Accordingly, the court need not address Doe's counterargument that Provident waived these two

**B.      Partial/Residual Disability**

Under the Policy, "Residual Disability" means that "you are not able to do one or more of your substantial and material daily business duties or you are not able to do your usual daily business duties for as much time as it would normally take you to do them." A plain reading of this provision reveals that the duties contemplated under the Residual Disability provision are far more specific to Doe's particular medical practice than are the duties contemplated under the Total Disability provision, which pertain to his occupation more generally. Moreover, the distinction between residual and total disability indicates that there is a continuum of disability within which Doe may be partially disabled if he cannot perform one or more particular duties whereas Doe may be totally disabled only if he cannot perform most or all of the duties of his occupation. *See Gladstone, MD v. Provident Life and Accident Ins. Co.*, 533 F. Supp. 2d 1227, 1232-33 (N.D. Ga. 2007). When the evidence in this case is viewed in a light most favorable to Doe, the court concludes that a reasonable jury could find that Doe is entitled to recover on his claim for Residual Disability because there are genuine issues of material fact as to whether Doe suffered from PTSD and whether the symptoms of his alleged PTSD prevented him from performing certain of his specific business duties with respect to ER medicine.

**C.      Bad Faith**

Provident contends that it is entitled to summary judgment on Doe's bad faith claim because the District of Columbia does not recognize a tort for bad faith breach of an insurance contract. Although the court previously denied Provident's motion to dismiss the bad faith claim

---

contentions by failing to raise them until this litigation. In addition, Provident contends that Doe's claim is time-barred because he filed suit more than five years after the expiration of the Policy's three-year limitations period. The court likewise has examined this contention and finds it to be without merit.

[#13], the District of Columbia Court of Appeals has since held that the District of Columbia does not recognize a tort for bad faith against insurance companies in handling policy claims. *Choharis v. State Farm Fire and Cas. Co.*, 961 A.2d 1080, 1087-88 (D.C. 2008) (citing *Fireman's Fund Ins. Co. v. CTIA-The Wireless Ass'n*, 480 F. Supp. 2d 7 (D.D.C. 2007)). Accordingly, the court holds that Provident is entitled to summary judgment with respect to Doe's bad faith claim.

### III.  CONCLUSION

For the foregoing reasons, it is this 9th day of March 2009, hereby

**ORDERED** that defendant's motion for summary judgment [#35] is **GRANTED** in part and **DENIED** in part.